## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DIANE FIELD and JAKE HOFFMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | 1:17-cv-02044 |
| | ) | Judge John Z. Lee |
| v. | ) | Magistrate Judge M. David Weisman |
| | ) | |
| HOUSING AUTHORITY OF COOK COUNTY | ) | First Amended Complaint |
| and ILLINOIS DEPARTMENT OF HUMAN | ) | |
| RIGHTS, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs Diane Field ("Diane") and Jake Hoffman ("Jake"), for their First Amended

Complaint against Defendants Housing Authority of Cook County ("HACC") and Illinois

Department of Human Rights ("IDHR"), allege and state as follows:

## EXECUTIVE SUMMARY

1.      The Housing Choice Voucher Program for Cook County, Illinois ("Housing

Voucher Program"), is a federal program that provides rental assistance to low income families

which is administered by HACC, under Section 8 of the United States Housing Act of 1937, as

amended at U.S.C. § 1437, *et seq.* At all relevant times, Diane and her son Jake have participated

in the Housing Voucher Program.

2.      HACC discriminated against Diane and Jake by unnecessarily and improperly

removing Jake from Diane's housing voucher after failing to properly inform Diane about

voucher program policies, and then denying her request for a reasonable accommodation to

restore him to her voucher.

3.      Both Diane and Jake are disabled. Diane has Asperger's Syndrome, Post-

Traumatic Stress Disorder ("PTSD"), and a mild traumatic brain injury, and as a result suffers

from communication and processing difficulties. Jake has PTSD, as well as aspects of Asperger's Syndrome, a mild traumatic brain injury, auditory processing delays, visual processing impairments, and impaired neurological and physical functioning of his hands.

4. In 2015, HACC unnecessarily and improperly removed Jake from Diane's housing voucher. In doing so, HACC also failed to tell Diane that once Jake was taken off her voucher, an administrative rule provided that she could not add him back. When Diane learned that Jake would graduate early from high school and was not yet ready to live on his own due to his disabilities, she asked HACC for a reasonable accommodation to add him back to her voucher. But HACC refused. As a result, when he graduated, Jake did not have anywhere to live and was forced to choose between homelessness and enlisting in the military. Jake enlisted in the military in the summer of 2016.

5. HACC's failure to make a reasonable accommodation discriminated against Diane and Jake, because it denied them an equal opportunity to participate in the Housing Voucher Program. This discrimination is all the more problematic because HACC has since acknowledged on multiple occasions that it could add Jake back to Diane's voucher.

6. HACC also violated Diane's rights in at least three other ways. First, HACC caseworker Phyllis Johnson threatened and intimidated Diane, merely because Diane informed Ms. Johnson that she would file a complaint with the Department of Housing and Urban Development ("HUD") or IDHR if HACC would not add Jake back to her voucher. Second, Ms. Johnson refused to allow Diane to use her speech and language therapist, Judy Ball, to participate in important communications with HACC. Third, by removing Jake from her voucher—which reduced Diane's voucher from a 2-bedroom to a 1-bedroom—HACC negatively impacted Diane's ability to buy a home and may also completely prevent Diane from being able

to buy a home in her community of Lemont, Illinois through HACC's Home Ownership

Program.

7.     IDHR is an administrative agency of the State of Illinois which receives federal

funds through grants and contracts with HUD to investigate housing complaints under the federal

Fair Housing Act and related state law.

8.     IDHR discriminated against Diane and violated her rights during its investigation

into the charge she filed against HACC, in the following ways:

a)     IDHR failed to conduct a neutral investigation into Diane's housing complaint and instead attempted to persuade Diane to settle her complaint with HACC under terms favorable to HACC and detrimental to Diane, and to voluntarily withdraw her charge against HACC, which Diane repeatedly resisted;

b)     IDHR improperly caused Diane to exclude in her perfected charge against HACC allegations that HACC caseworker Phyllis Johnson threatened Diane;

c)     IDHR investigator Stan Moen violated Diane's right to have her aide, Suzy Woods, help her communicate with IDHR. Instead Mr. Moen forced Ms. Woods to speak for Diane, effectively removing Diane from direct participation in IDHR's investigation. This violated IDHR's obligations under the Americans with Disabilities Act ("ADA") to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a) (1);

d)     IDHR also made impermissible credibility determinations in violation of the injunction order upheld by *Cooper v. Salazar*, 196 F.3d 809 (7th Cir. 1999), including crediting HACC employees' statements over Diane's statements and others supporting her version of events; and

e)     IDHR conducted an unnecessarily prolonged investigation that resulted in significant harm and prejudice to Diane and Jake.

9.     Plaintiffs have suffered substantial damages as a result of HACC's and IDHR's

violations. Plaintiffs thus seek declaratory relief, injunctive relief, damages, and reasonable

attorneys' fees and costs.

## JURISDICTION & VENUE

10.     This case is filed under federal question jurisdiction under 28 U.S.C. § 1331. The

Fair Housing Act, as amended ("FHAA"), prohibits discrimination against "any person in the

terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or

facilities in connection therewith, because of race, color, religion, sex, familial status, or national

origin." 42 U.S.C. § 3604(b). Discrimination on the basis of a disability is also prohibited.

42 U.S.C. § 3604(f). And it is unlawful to "coerce, intimidate, threaten, or interfere with any

person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on

account of his having aided or encouraged any other person in the exercise or enjoyment of, any

right granted or protected by sections 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

Section 504 of the Rehabilitation Act, as amended at 29 U.S.C. § 794 ("Section 504") and the

ADA, 42 U.S.C. § 12101, *et seq*. have similar provisions.

11.     Venue is proper in this Court because the acts complained of occurred and the

parties reside in, or do business in, the Northern District of Illinois.

## PARTIES

**Plaintiff Diane Field**

12.     Diane Field is a low-income tenant who rents a house at 215 E. Custer St. in

Lemont, Illinois through the Housing Voucher Program. She has lived in Lemont for

approximately 45 years.

13.     Diane has Asperger's Syndrome, which is a communication disorder that makes it

difficult for her to understand or use language and speech to communicate with others, as well as

to learn and use common social skills. Diane does not suffer from mental illnesses.

14.     Diane also has PTSD and a mild traumatic brain injury as a result of domestic violence. Diane's PTSD makes it difficult for her to communicate when confronted by overbearing authority figures.

15.     Because Diane suffers from communication and processing difficulties, she often needs help communicating. Accordingly, Diane has received regular speech and language therapy from Ms. Ball, who understands Diane's communication and processing issues, and who has helped her manage them, especially when Diane is in stressful situations. Diane has also received help from a disability rights advocate named Suzy Woods, who is an Education Liaison and Policy Coordinator for the Illinois Assistive Technology Program, an Illinois state program designed to help people with communication disorders like Diane's.

16.     Diane receives Social Security benefits from the federal government for her disabilities.

**Plaintiff Jake Hoffman**

17.     Jake Hoffman is Diane's son who is currently 21 years old. He is enlisted in the United States Army and is currently posted at the U.S. Army Base at Fort Carson, Colorado.

18.     Jake is disabled and has PTSD and mild traumatic brain injury as a result of domestic violence. He also has aspects of Asperger's Syndrome, auditory processing delays, visual processing impairments, and impaired neurological and physical functioning of his hands.

19.     Jake has received neurofeedback therapy ("NFB Therapy") and occupational therapy for his disabilities. NFB Therapy is a noninvasive therapy that helps people with Jake's conditions and learning disabilities. NFB Therapy is a restorative treatment modality that helps patients overcome developmental trauma, which in Jake's case lasted for over ten years. Effectiveness of NFB Therapy often depends on patients receiving regular treatment. Before Jake

enlisted in the military in August 2016, he had been receiving NFB Therapy regularly since 2011.

20.     Jake's regular NFB Therapy helped him successfully take math classes in high school and improved his overall mental health and behavior.

21.     Jake received Social Security benefits from the federal government for his disabilities until he enlisted in the military in August 2016.

**Defendant HACC**

22.     HACC is a public housing authority headquartered in Chicago, Illinois, at 175 W. Jackson Blvd. #350, Chicago, Illinois 60604.

23.     HACC provides assistance to low income residents seeking housing in Cook County, Illinois.

24.     HACC administers the federal Housing Voucher Program under Section 8 of the United States Housing Act of 1937, as amended at 42 U.S.C. § 1437, *et seq.*

25.     HACC receives funding from the federal government and is required to follow federal regulations and laws, including prohibitions on discrimination.

**Defendant IDHR**

26.     IDHR is an administrative agency of the State of Illinois with offices in Chicago and Springfield, Illinois. Its Chicago office is located at 100 West Randolph Street, 10th Floor, Chicago, Illinois 60601.

27.     IDHR receives federal funds through grants and contracts with HUD under the Fair Housing Assistance Program to investigate housing complaints under the FHAA and related state law.

## FACTS

### Diane is a participant in the Housing Voucher Program administered by HACC

28.     At all relevant times, Diane has participated as the head of household in the Housing Voucher Program, which is a federal program that provides rental assistance to low income families.

29.     HACC administers the Housing Voucher Program for Cook County, Illinois.

30.     Until Jake was improperly and unnecessarily removed from Diane's voucher by HACC around June 2015, he participated in the program as Diane's family member.

31.     Under the Housing Voucher Program, if a family is eligible to participate and housing is available, HACC provides the family a voucher. Both the family and HACC then make rent payments to the unit owner.

32.     Since February 2015, Diane has also participated in both the Home Ownership Program and the Family Self-Sufficiency Program ("Self-Sufficiency Program"). Both programs are administered by HACC.

33.     The Home Ownership Program helps low income families buy a home. To be eligible for the Home Ownership Program, a family must participate in the Housing Voucher Program. HACC also gives preference to candidates who are in the Self-Sufficiency Program and people with disabilities.

34.     The Self-Sufficiency Program helps participants acquire additional education and job skills.

### Diane enrolled Jake in a residential therapeutic high school in Carbondale, Illinois

35.     Jake's disabilities required him to stay in high school after he turned 18 years old.

36.     Diane has been very active as a single parent advocating on behalf of her disabled son, Jake.

37.     In early 2015, Jake was enrolled in Lemont High School in Lemont, Illinois. But Lemont High School was unable to accommodate Jake's learning disabilities or teach him the skills he needed to learn to live independently.

38.     Instead of letting Jake fall helplessly behind or fail to complete high school, Diane negotiated with Lemont High School to arrange for Jake to be placed in a residential therapeutic high school called Brehm Preparatory School ("Brehm Prep") at public expense.

39.     Brehm Prep is a not-for-profit boarding school for students with disabilities or differences.

40.     Brehm Prep is located in Carbondale, Illinois—about a five-hour car ride from Lemont, where Diane and Jake lived.

41.     Around the same time that Diane was arranging for Jake to attend Brehm Prep, Diane was also coordinating a plan for Jake's transition to post-high school life with the Illinois Department of Human Services Division of Rehabilitation Services ("DRS").

42.     DRS agreed to subsidize Jake's attendance at the College of DuPage, a local community college where Jake could continue his studies after completing high school.

43.     The plan was for Jake to move back with Diane in their rental apartment in Lemont and attend the College of DuPage after he graduated from Brehm Prep.

44.     The College of DuPage was a short commute from their rental apartment in Lemont.

**Jake needed to receive NFB Therapy while attending Brehm Prep**

45.     Every student in need of special services is required by law to have an Individualized Education Plan ("IEP"). Jake had an IEP.

46.     An IEP is a written statement that describes the needs of each individual special services student.

47.     Jake's IEP required that he be able to continue receiving NFB Therapy while attending high school at Brehm Prep.

48.     Around September 2015, Jake began attending Brehm Prep.

**While attending Brehm Prep, Jake returned to Lemont on weekends to get treatment for his disabilities**

49.     Jake began receiving NFB Therapy in 2011.

50.     Because there were no locally trained occupational therapists certified to give NFB Therapy in Carbondale, where Brehm Prep was located, Jake needed to travel back to Lemont to receive his treatment.

51.     Accordingly, about every other week, on Friday night, Jake would travel from his dormitory at Brehm Prep to Lemont to obtain NFB Therapy from occupational therapist Linda Kramer; on Sunday he would return to Carbondale to stay in the dormitory.

**HACC knew that Diane and Jake were disabled**

52.     At all relevant times, HACC knew that Diane and Jake were disabled.

53.     For example, on June 5, 2015, while Diane was in the process of preparing her housing renewal paperwork, Diane emailed two staff employees at HACC and asked if she could "please meet with you or your supervisor to assist me with making sure I am delivering everything required" because "I have a disability which sometimes requires assistance with this type of paperwork organization."

54.     In the same email to HACC, Diane stated that Jake "has complex learning disabilities."

55.     IDHR has acknowledged that "[I]t is uncontested that Complainant is disabled."

**Diane requested HACC's assistance to answer questions about whether to keep Jake on her voucher, and the potential impact on her and Jake**

56.     Before Jake left to attend Brehm Prep, Diane contacted HACC with questions about her Housing Voucher Program renewal paperwork.

57.     In response to Diane's June 5, 2015 email seeking assistance with her voucher renewal paperwork, HACC's Sylvia Peterson referred Diane to HACC manager Angela Francis and another employee, and explained that "[t]hese are the ones you should contact if you should have any questions or issues."

58.     On June 9, 2015, Diane replied that she has "complex issues regarding my son's education status" and "income reporting for Jake." Diane then specifically raised a question about how Jake's income would be calculated if he were to remain on her voucher: "if Jake is left on the voucher while he resides at school and I subsequently must include his income, how will he have his income to live at school?"

59.     HACC did not answer Diane's questions by email, but instead, on June 9, 2015, HACC's Debra Frazier sent an email to Diane suggesting that Diane's questions would be answered in person at HACC by Ms. Francis, whom Diane "will be meeting with" to discuss questions about her paperwork. Ms. Francis was the HACC manager previously identified as one of the people to contact with any questions or issues, including about Jake.

60.     Diane then sent a follow-up email to Ms. Francis reiterating that she had "numerous questions about income to report and how to categorize [her] son."

**HACC failed to properly inform Diane about the Housing Voucher Program's policies, resulting in Jake's unnecessary and improper removal from Diane's voucher**

61.     Around June 10, 2015, Diane met with Ms. Francis in person at HACC's office to discuss Diane's questions about her housing renewal paperwork, including about whether to keep Jake on her voucher.

62.     When Diane told Ms. Francis that Jake would be attending Brehm Prep to finish high school, Ms. Francis offered her two options. Option one: Jake could stay on her voucher, but his income would be included in calculating her monthly rental assistance payment, even though Jake would need his disability income to live away from home. Option two: HACC could remove Jake from her voucher, and his income would not be counted.

63.     Diane agreed to remove Jake from her voucher with the understanding that it would be possible to add Jake back after he finished high school.

64.     In setting forth these two options, HACC failed to provide Diane all the relevant and critical information necessary for her to make an informed decision about what would happen if Jake stayed on her voucher and what would happen if he were removed.

65.     In particular, HACC failed to communicate that Diane could have kept Jake on her voucher with little or no impact on Diane's monthly rental assistance payments, or any financial impact on Jake.

66.     HACC did not inform Diane that, pursuant to HUD and HACC's own rules, Jake was permitted to stay on her voucher as a temporarily absent family member while attending Brehm Prep. *See* HACC Administrative Plan § 3-I.L., at p. 82 (2015).

67.     HACC also failed to inform Diane that under HUD and HACC rules, HACC could have exempted most of Jake's disability income because he was a full-time student. As a full-time student, a maximum of $480 of Jake's annual income could have been counted in calculating Diane's household income for her rental assistance payment. 24 C.F.R. § 5.609(c)(11); HACC Administrative Plan § 6-I.D., at p. 86 (2015). Even HACC's attorney has acknowledged that this provision would have applied to Jake while he was at Brehm Prep.

68. Critically, pursuant to 24 C.F.R. §§ 5.603(b) and 5.611(a) (3) and HACC Administrative Plan § 6-II.D., at p. 104 (2015), the entire $480 of Jake's disability income could have been totally exempted from the calculation of Diane's household income because HACC was required to reduce Diane's income by the amount of Jake's unreimbursed medical bills. And Jake's medical bills were well above $480 due to the money spent to treat Jake's disability.

69. Specifically, federal regulations provide that "[i]n determining adjusted income, the responsible entity must deduct the following amounts from annual income: . . . Unreimbursed medical expenses of any . . . disabled family." 24 C.F.R. § 5.611(a).

70. Importantly, at the time HACC had Jake removed from Diane's voucher, it knew that: (a) Jake would be temporarily away at school, and (b) Diane was paying a large sum of money in medical expenses each month for her and Jake.

71. This means that HACC knew or should have known that Jake could have remained on Diane's voucher while he was temporarily away at Brehm Prep, with little or no financial impact to Diane or Jake.

72. HACC thus should have told Diane that while Jake was away at school, he could stay on her voucher with little or no impact on their ability to pool their resources, because Jake's income while away at school would not increase the family's adjusted income and therefore would not increase the amount of money Diane would need to pay in rent.

73. Additionally, HACC failed to tell Diane that it had a custom, practice, or policy under which a family member would not be added back to a housing voucher once that person was removed from the voucher.

74. Nor did HACC ever provide Diane with the name and contact information of HACC's Section 504/ADA Coordinator ("ADA Coordinator"). On information and belief,

HACC was required to do so under the Voluntary Compliance Agreement with HUD in effect at the time, as well as other federal regulations. The ADA Coordinator is responsible for coordinating and monitoring HACC's compliance with Section 504 and Title II of the ADA, as well as state civil rights requirements regarding discrimination and harassment based on disability. The ADA Coordinator is also responsible for overseeing prevention efforts to avoid Section 504 and ADA violations.

75.     Had Diane been allowed access to such an ADA Coordinator, she would have been able to more effectively access and participate in HACC's programs, as well as have access to education about pertinent HACC rules, policies, practices, and services.

76.     Had Diane been provided with the relevant information needed to make an informed decision, there is no legitimate reason why she would have elected to remove Jake from the voucher because there would have been no reason to do so.

77.     Instead, on June 10, 2015, the same day Diane went to HACC to speak with Ms. Francis about her housing renewal paperwork and Jake's status, Diane was steered by HACC to sign a form removing Jake from her voucher. That form was personally notarized by Ms. Francis—the HACC manager to whom Diane was referred to answer questions about this exact issue.

78.     Diane trusted that her HACC caseworker, Ms. Francis, and Ms. Francis' supervisor, Ms. Frazer, would do their jobs and look out for her and her family's interests, especially knowing that Diane and Jake were disabled, and that Jake was supposed to return home after high school.

79.     But because of HACC's failures, Diane was completely unaware that she could have kept Jake on her voucher with little to no effect on her monthly rental assistance payments,

and that HACC would refuse to add Jake back to her voucher after he graduated from therapeutic high school.

80.     Had Diane been properly informed by HACC and not removed Jake from her voucher, everything else that happened to Jake and Diane could have been avoided.

**HACC refused Diane's request for a reasonable accommodation to restore Jake to her voucher, without properly considering her request**

81.     Jake was originally scheduled to graduate from Brehm Prep in August 2016. But in early 2016, Diane learned that Brehm Prep had moved Jake's graduation date up to June 2016.

82.     Around the same time, Diane learned that Jake was not going to meet his independent living goals, which meant that he would be unable to live on his own when he graduated high school. Because Jake's disabilities prevented him from living independently, he would need to move back home to live with Diane.

83.     In early 2016, Diane contacted and asked HACC to restore her 2-bedroom voucher so Jake could move back in with her after he graduated.

84.     Diane explained that after graduation, Jake was planning to attend the College of DuPage.

85.     Diane had multiple conversations with HACC staff—including emails and phone conversations—about adding Jake back to her voucher.

86.     Diane repeatedly explained to HACC the urgency of her requests and that they were driven by concerns that Jake could become homeless if he was not restored to her voucher by the time he graduated.

87.     For example, in a February 5, 2016 email to HACC caseworker Phyllis Johnson, Diane explained that if HACC was unable to resolve the situation with Jake by April 1, she would have to file a complaint with HUD or IDHR. Diane also reminded Ms. Johnson that while

she wanted to respect HACC's timeframe, she needed HACC to make a decision because Jake was a young man with disabilities who might become homeless unless he was allowed to move back in with Diane.

88. Diane and Ms. Johnson then had a telephone conversation. Diane asked Ms. Johnson to add Jake back to her voucher, but Ms. Johnson told her that HACC could not add him back because HACC has an administrative rule that once someone is removed from a voucher, that person generally cannot be put back on.

89. Later that same day, Diane emailed HACC supervisor Sheryl Seiling explicitly requesting to have Jake added back to her voucher: "**I am asking again, may my son please be added back to my voucher now that he is graduating from his high school where he resides?**"

90. Despite Diane's pleas, HACC denied Diane's request to add her son back to the voucher.

91. In fact, HACC failed to properly consider Diane's request for a reasonable accommodation to restore Jake to her voucher, let alone grant it.

92. Rather, HACC's Ms. Johnson told Diane that it has a rule that once someone is removed from a housing voucher, that person cannot be reinstated.

93. By denying Diane's request for a reasonable accommodation outright, Ms. Johnson did not even allow the interactive process of assessing whether Diane's and Jake's disabilities could be accommodated by making a modification to HACC's administrative rule.

94. At no time did anyone at HACC ever disclose to Diane or anyone acting on her behalf the source or citation to that administrative rule.

95. On information and belief, Plaintiffs believe that HACC was referring to the following provision from HACC's Administrative Plan: "The HACC may not consider the return of a family/household member who was previously removed from the household." HACC Administrative Plan § 11-II.B, at p. 200 (2015).

96. HACC's hasty refusal to consider making a reasonable accommodation to make an exception to its rule and restore Jake to Diane's voucher was not even in compliance with HUD and HACC's own regulations on how to handle requests for reasonable accommodations.

97. The existence of an administrative rule against restoring removed household members to a voucher could not possibly support HACC's denial of Diane's request for a reasonable accommodation, because she was requesting an exception to that very rule. In other words, Diane asked that she be granted an exception to the rule to restore her disabled son to her voucher, and HACC refused because of the rule itself. That type of circular logic violates HACC's own policies and procedures for responding to requests for reasonable accommodations.

98. HACC's written policies and procedures for dealing with reasonable accommodations, which are memorialized in HACC's Administrative Plan, specifically provide that "[i]f an applicant or participant indicates that an exception, change, or adjustment to a rule, policy, practice, or service is needed because of a disability, HUD requires that the HACC treat the information as a request for a reasonable accommodation, even if no formal request is made." HACC Administrative Plan § 2-II.A., at p. 18 (2015).

99. Additionally, HACC's Administrative Plan further provides that the request for reasonable accommodation here is precisely the type of request it contemplates: "One type of disability discrimination prohibited by the Fair Housing Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be

necessary to afford a person with a disability the equal opportunity to use and enjoy a program or dwelling under the program." HACC Administrative Plan § 2-II.A., at p. 17 (2015).

100.     HACC's Administrative Plan also states: "Requests for accommodations must be assessed on a case-by-case basis, taking into account factors such as the cost of the requested accommodation, the financial resources of the HACC at the time of the request, the benefits that the accommodation would provide to the family, and the availability of alternative accommodations that would effectively meet the family's disability-related needs." HACC Administrative Plan § 2-II.C., at p. 20 (2015).

101.     Instead of properly considering whether Diane's request would be a reasonable accommodation to HACC's administrative rule, or weighing the factors outlined in HACC's Administrative Plan, HACC rejected Diane's request for a reasonable accommodation, without even giving it any serious consideration.

102.     In fact, the final investigative report published by IDHR in June 2017 noted that HACC denied Diane's request for a reasonable accommodation because it "was not medically necessary, and . . . it would fundamentally alter the terms of the program."

103.     But HACC's contention that the accommodation "was not medically necessary" ignores substantial evidence that HACC knew that Jake was a young disabled man who could not live on his own due to his disabilities (which was why he was attending Brehm Prep), and that HACC knew or should have known that the accommodation was necessary for him to obtain access to the Housing Voucher Program and to avoid the possibility of homelessness.

104.     Plus, adding a young, disabled man back to a housing voucher he was previously on could not possibly be construed as "fundamentally alter[ing] the terms of [HACC's] program."

105.     In fact, HACC has since acknowledged on multiple occasions that it could add Jake back to Diane's voucher.

106.     For example, HACC agreed that it could restore Jake to Diane's voucher in May 2016, but contended that to do so Diane would need to pay back rent (which, as explained below, was problematic because it would have put Diane in debt to HACC and would also have jeopardized her ability to participate in the Self-Sufficiency Program and buy a home through the Home Ownership Program).

107.     Then, in September 2017, HACC conveyed to Diane (through IDHR investigator Stan Moen) that it could add Jake back to her voucher without her having to pay back rent. HUD even agreed that doing so would be "fair" and "complied" with HACC's obligations.

108.     Perhaps most tellingly, HACC told Diane that even if she chose not to add Jake back to her voucher right away, she could probably do so after Jake was discharged from the military: "As to the potential of him [Jake] needing to be added back as a household member if he was discharged from the military, HACC would likely approve such a request as they do not want to make someone leaving active military service homeless."

109.     If HACC could make an exception to its rule to add a veteran back to a housing voucher to avoid homelessness without "fundamentally alter[ing] the terms of [its] program," it could also do so for a disabled person. And if it was true in September 2016, it was also true in early 2016 when HACC denied Diane's initial request.

**HACC also discriminated against Diane by refusing to allow her speech and language therapist, Ms. Ball, to participate in important communications with HACC about Diane's request for a reasonable accommodation**

110.     HACC, through its employee Phyllis Johnson, also discriminated against Diane by refusing to allow her speech therapist, Ms. Ball, to participate in important communications

between Diane and Ms. Johnson in early 2016 when Diane was trying to have Jake restored to her voucher.

111. In an email Diane sent to Ms. Johnson on February 5, 2016, Diane again explained that she has a communication disorder, which is why she wanted Ms. Ball involved in communications: "Please do not be offended of my continuing to include my speech therapist. I have a processing issue so the speech therapist help [sic] me understand both what you are saying and what you are not saying. I hope this makes sense to you. And [sic] I certainly do not mean any disrespect to you."

112. After receiving Diane's email, Ms. Johnson and Diane spoke on the phone. During that call, Diane requested that Ms. Ball join the conversation with HACC by telephone from her office to help Diane communicate her concerns without being misunderstood.

113. Instead, Ms. Johnson indicated that she would include Ms. Ball if she came to the HACC office personally.

114. Diane informed Ms. Johnson that Ms. Ball could not go to HACC's office in Chicago, because Ms. Ball has an active practice with many clients who have previously scheduled appointments. Ms. Ball could not just leave her practice and cancel her appointments.

115. Diane also informed Ms. Johnson that her medical insurance would not cover Ms. Ball's services off of Ms. Ball's medical campus where her clinical office is located.

116. Even though Diane explained all of this to Ms. Johnson, Ms. Johnson still refused Diane's request to allow Ms. Ball to participate in her phone call with Ms. Johnson to help clear up any misunderstandings between Ms. Johnson and Diane about the situation involving Jake.

117. HACC is obligated to make its communication with Diane as effective as communication with a non-disabled person.

118.     Such reasonable accommodations are routinely granted to the deaf who are provided sign language interpreters to assist in communication with others.

**HACC threatened and intimidated Diane**

119.     Not only did HACC refuse Diane's requests for reasonable accommodations, it also threatened and intimidated her, and retaliated against her.

120.     In an email to Ms. Johnson on February 5, 2016, Diane explained to Ms. Johnson that she needed her son to be reinstated on her voucher. Diane also explained that she would file a complaint with HUD or IDHR if necessary to gain reinstatement of her son.

121.     During a phone conversation between Diane and Ms. Johnson that same day, in addition to denying Diane's request for a reasonable accommodation, Ms. Johnson raised her voice and said, don't threaten me, stop talking, it's your turn to listen— I'm talking now. Diane knew that threatening a case worker is grounds for termination from HACC's programs.

122.     Diane did not threaten Ms. Johnson on that call, but she did become frightened by what Ms. Johnson said to her on the phone. Diane was also intimidated by Ms. Johnson because she felt that if she now filed a complaint with HUD or IDHR, it could put her participation in the Housing Voucher Program in jeopardy.

123.     After the phone call with Ms. Johnson, Diane sent an email to HACC supervisor Ms. Seiling about what happened, namely that Ms. Johnson told her to "'be quiet, it was [her] time to listen,'" and elevated her voice.

**Diane filed a housing discrimination complaint against HACC**

124.     Because of HACC's refusal to grant her request for a reasonable accommodation, and the threats and intimidation from Ms. Johnson, Diane filed a housing complaint with IDHR.

125.     Then, on February 17, 2016, Diane filed a written administrative charge with HUD as a dual federal/state complaint regarding HACC's violations. HUD referred the administrative charge to IDHR for investigation under the Fair Housing Assistance Program.

126.     The administrative charge stated that "in January 2016, . . . [Diane] requested that her son be added back to her voucher because he is graduating in June 2016 and will be moving back home and cannot live independently. . . . [Diane] alleges that . . . [HACC] has told her that her son cannot be added to the voucher because of an administrative code."

127.     IDHR staff investigator Stan Moen was assigned to investigate Diane's charge.

128.     On February 19, 2016, Mr. Moen emailed Diane to explain that he was the investigator from IDHR assigned to her case.

129.     On March 16, 2016, Diane emailed Mr. Moen. She explained that HACC did not offer a reasonable accommodation when she asked Ms. Johnson if HACC could add Jake back to her voucher. "Ms. Johnson simple [sic] said no, Jake could not move home." She also explained that IDHR's decision was time-sensitive: "If you send it [her charge] to HUD, HUDs [sic] concern was that the case may not be heard before Jake graduates May 27th. This young man with disabilities is in jeopardy of becoming homeless and furthermore destabilizing all the rehabilitation myself and the school system have obtained for him. Please prevent this from happening by allowing our case to move forward." Jake "is not able to find, apply, secure and successfully maintain his own living accommodations yet."

130.     On March 30, 2016, HACC filed a verified response to Diane's housing complaint.

**HACC offered to add Jake back to Diane's voucher, but unjustifiably conditioned its offer on requiring Diane to pay back rent to HACC**

131.     After months of regularly communicating with IDHR, on May 13, 2016, with Jake due to graduate in June, Diane again contacted IDHR investigator Stan Moen, asking "whether or not Jake can move home."

132.     On or around May 23, 2016—more than three months after HACC refused Diane's February 2016 request for a reasonable accommodation—HACC memorialized its position in a letter from one of HACC's attorneys, stating that HACC would be able to restore Jake to Diane's voucher, but only "retroactively."

133.     However, HACC conditioned its offer on Diane's agreement to pay what HACC considered "back rent," consisting of the difference in payments between a 1-bedroom voucher and a 2-bedroom voucher for when Jake attended Brehm Prep from September of 2015 until his graduation in June of 2016, approximately 10 months.

134.     In communicating HACC's conditional offer to Diane, IDHR Investigator Mr. Moen explained that "[i]t seems that [HACC] is contending that they are following federal rules in requiring reimbursement for the rent differential from Sept 2015 forward, in order for them to retroactively put your son back on your voucher effective September 2015."

135.     But while IDHR was publicly presenting HACC's offer to Diane, in an email to HUD seeking guidance about the situation, IDHR was privately expressing skepticism about the back rent condition: "**We would like to resolve this case, but since we are not experts on how the Section 8 program works, it is not clear whether Complainant would be obligated to pay this rent differential.**"

136.     Months later, HUD acknowledged that the back rent condition was not required for HACC to grant the reasonable accommodation requested by Diane.

137.    But even before that, HACC knew or should have known that there was no way that Diane could accept that supposed offer without significant consequences.

138.    First, at the time of HACC's offer to add Jake back with the condition of back rent, HACC knew or had reason to know that if Diane accepted, it would have put her—a low-income disabled tenant—in debt to HACC.

139.    Second, HACC knew or had reason to know that if Diane accepted the offer, it would have jeopardized her participation in the Home Ownership Program and her ability to buy a home, because one of the conditions for Diane's continued participation in that program was that she could not owe any money to any housing agency, including HACC.

140.    On May 15, 2016, Diane explained to IDHR investigator Stan Moen that acceptance of HACC's initial offer would exclude her from participating in the HACC Home Ownership Program because having any debt to HACC would cause her to violate a rule for the program, under which you cannot "owe rent or other amounts to the HACC or to another Public Housing Agency."

141.    HACC failed to make any other offers to Diane until after Jake graduated from Brehm Prep, when he no longer could live in the student dorms.

**HACC and IDHR's improper refusals and delays forced Jake to choose between homelessness and enlisting in the military**

142.    From around May through September, Diane kept asking that HACC not force her to pay back rent or in the alternative to make a reasonable accommodation of excluding back rent so she could still be eligible to participate in the Home Ownership Program.

143.    HACC claimed it could not waive the back rent requirement or grant a reasonable accommodation to do so unless HUD agreed that it was a reasonable accommodation HACC could make.

144.    But it took HACC until around September 2016, almost seven months, from Diane's original request for a reasonable accommodation, to confirm this with HUD.

145.    HACC's final offer to Diane gave her two options: (1) she could either add Jake back to her voucher without having to pay back rent, but Jake's income would be included in the family's, or (2) she could keep the 1-bedroom voucher (which would continue to hamper her ability to purchase a home through the Home Ownership Program, as further described below).

146.    In other words, HACC and HUD acknowledged that they could make a reasonable accommodation to Diane to restore Jake to the voucher without requiring Diane to pay any "back rent."

147.    By the time they came around to that realization, however, Jake had already graduated from high school, and was no longer able to live in Brehm Prep's dorms or Diane's apartment.

148.    Jake was thus faced with a stark choice: either be homeless as an unemployed, disabled adult or enlist in the military. Jake chose the military and enlisted in August 2016.

149.    Jake's enlistment eliminated his opportunity to attend community college near Lemont, Illinois with the assistance of DRS and Ligas. It also prevented Jake from regularly receiving NFB Therapy, which was critical to treating Jake's developmental disabilities and ultimately undid some of the developmental progress Jake had made since 2011.

150.    Had Jake been restored to Diane's voucher before graduating from Brehm Prep, he would have been in a position to return home and enroll in the local community college, thus allowing Diane to take advantage of the $480 annual cap on Jake's income, which could have then been offset by Jake's medical expenses.

**HACC's failure to grant a reasonable accommodation also prevented Diane from buying a home in Lemont, Illinois through HACC's Home Ownership Program**

151.     In addition to the harm discussed above, HACC's conduct also resulted in further harm because it negatively impacted Diane's ability to purchase a home through the Home Ownership Program.

152.     HACC's Home Ownership Program is designed to help low income families buy a home in the neighborhood of their choice and to assist families in making their monthly mortgage payments.

153.     As a participant in the Home Ownership Program, the mortgage amount a participant qualifies for is based on the size of her housing voucher (*i.e.* 1-bedroom, 2-bedroom, *etc.*) and the specific neighborhood in which you want to buy a house.

154.     So, for example, in some neighborhoods, like Lemont, the allotment that the Home Ownership Program would provide for a 1-bedroom voucher is simply not enough to qualify for a mortgage to purchase a home in Lemont, Illinois.

155.     Around February 2015, HACC accepted Diane into its Self-Sufficiency Program and its Home Ownership Program. But it took 10 months for HACC to send Diane a notification letter of her acceptance.

156.     HACC's and IDHR's violations of law, extensive time delays, and inability to work efficiently with one another, have negatively impacted and may completely prevent Diane from buying a home and eventually disqualify Diane from participating in the Home Ownership Program and achieving home ownership.

157.     At all relevant times, the HACC caseworker assigned to Diane in the Self-Sufficiency Program and the Home Ownership Program was Phyllis Johnson, the same caseworker who refused to consider adding Jake back to Diane's voucher.

158.    In December 2015, about 10 months after Diane was accepted into the Self-Sufficiency Program and the Home Ownership Program, and several months after HACC had removed Jake from her voucher, HACC notified Diane that she needed to complete a home ownership counseling session before she could purchase a home. She was also told she had to wait to buy her house until after she completed home ownership counseling with HACC.

159.    In May 2016, Diane was finally permitted to attend a HACC homebuyers' eight-hour counseling session that was a requirement for her to participate in the Home Ownership Program.

160.    At that time and for the first time, Diane was informed by Glen Perniconi, her HACC-assigned mortgage loan officer, that her 1-bedroom voucher would not be valued high enough as an allotment amount to meet the minimum amount required to make monthly mortgage payments she would have to make for her modestly chosen $150,000 house in Lemont, Illinois.

161.    As a result of gentrification, over the past two years it has grown increasingly difficult to find homes in Lemont for under $150,000, which is what Diane would have been able to afford on a two-bedroom voucher.

162.    Mr. Perniconi also told Diane that the 2-bedroom voucher she originally had (when Jake was still included) would have been valued high enough to make a monthly mortgage payment for her chosen house in Lemont.

163.    Had HACC provided a more reasonable time frame for offering the 8-hour home ownership seminar and not caused over a year of delay in approval to purchase, Diane and Jake would have been able to purchase a home before he graduated from Brehm Prep. Instead, Jake enlisted in the army in August of 2016 to avoid homelessness.

164.    And if HACC had left Jake on Diane's voucher, or if HACC had timely restored him to her voucher when she requested a reasonable accommodation while Jake was temporarily attending Brehm Prep, then Diane would have been able to buy a home in Lemont and Jake would not have had to join the military.

165.    Additionally, because HACC failed to provide Diane with the requested reasonable accommodation, she was not eligible to buy her chosen, low cost home in her community of Lemont, where she grew up and has lived most of her life, resulting in substantial financial harm to her as a low income person.

166.    Approximately two years of mortgage payments—which would have roughly been over $24,000—could have been made by now by Diane and HACC, allowing her to build up equity, but instead she was forced to continue spending that money on rent.

**IDHR was required to conduct a fair and neutral investigation into Diane's housing discrimination charge**

167.    IDHR exacerbated the harm caused by HACC, and also caused independent harm to Diane and Jake.

168.    After Diane filed her initial housing complaint with IDHR in February 2016, IDHR was tasked with investigating Diane's charge of discrimination. Pursuant to the Fair Housing Assistance Program, Diane's complaint was cross-filed with HUD and IDHR.

169.    IDHR's charge process has five steps: Intake, an optional Mediation, Investigation, Findings & Results, and Legal Review.

170.    There was no optional Mediation, and therefore after Diane's case finished Intake it moved into the Investigation phase.

171.    IDHR investigator Stan Moen was assigned to investigate Diane's case.

**IDHR did not conduct a fair and neutral investigation**

172. During the Investigation phase, "IDHR's role is to conduct a **neutral** investigation of the allegations in the charge." IDHR, Filing a Charge, Charge Process, Investigation, https://www.illinois.gov/dhr/FilingaCharge/Pages/Investigation.aspx (last visited on Nov. 16, 2017).

173. In violation of that mandate, IDHR did not conduct a neutral investigation of Diane's charge.

174. First, on or about February 20, 2016, Mr. Moen spoke with HACC staff about Diane's administrative charge.

175. Mr. Moen subsequently told Diane that HACC staff claimed that when they removed Jake from her voucher, HACC staff had told her that he could not be reinstated later.

176. Diane objected to this false statement, but Mr. Moen told her that if he proceeded with the investigation, Diane's complaint would be dismissed as invalid.

177. Mr. Moen made these statements even though such a dismissal would be in violation of the injunction in *Cooper v. Salazar*, which prevents IDHR from dismissing complaints based on credibility determinations not subject to cross-examination.

178. Subsequently, Diane's aide, Ms. Woods, asked Mr. Moen for IDHR's proof that HACC actually informed Diane that she could not add Jake back to her voucher once he was removed. Ms. Woods told Mr. Moen that she has known Diane for several years and as a strong advocate for her disabled son Diane would likely not have agreed to this.

179. IDHR never produced any proof.

180. Second, without justification, IDHR misled Diane into not including her allegations that Ms. Johnson of HACC threatened and intimidated her. In her February 5, 2016, Housing Complainant Information Sheet, Diane wrote: "when i asked ms Johnson about

28

consideration due to disability status, she told me that was not possible. when I informed her of contacting human rights for consideration of policy change, she told me, 'don't threaten me' she raised her voice, told me not to speak, etc. . . "

181.　But in a meeting with IDHR employee Daniel Padilla, Mr. Padilla told Diane that she could not prove this and that it should not be included in her charge against HACC. As a result, and because of Mr. Padilla's improper representations, Diane did not include these allegations in her perfected charge.

182.　Third, instead of carrying out a neutral investigation into whether HACC wrongfully refused to grant Diane a reasonable accommodation to add Jake back to her voucher, IDHR instead tried to pose as a mediator between Diane and IDHR and to resolve her case on terms favorable to HACC and detrimental to Diane. IDHR investigator Stan Moen acted as a go-between, taking HACC's offers and relaying them to Ms. Woods, who would then talk to Diane.

183.　Fourth, IDHR also pressured Diane to accept HACC's offers. For example, on May 25, 2016, investigator Stan Moen tried to buttress HACC's contention that Diane owed back rent by telling her that "[t]he rules they [HACC] quote does [sic] deal with temporary absence, even for a disabled member of your household, and that the household income in question, also includes social security disability income." He went on to tell Diane that if the military had accepted Jake, "this whole matter would be a game changer, as all of these disputes, would no longer matter." But this statement was false because the dispute was over whether HACC failed to grant a reasonable accommodation back in February 2016.

**IDHR's unnecessarily prolonged investigation caused significant harm**

184.　IDHR also unnecessarily prolonged its investigation, which resulted in significant harm and prejudice to Diane and Jake.

185.    IDHR is required by law to complete its investigation within 100 days after an administrative charge is filed, unless it is impracticable to do so. 775 ILCS 5/7-B-102(C)(1).

186.    Diane filed her administrative charge with IDHR on or around February 17, 2016.

187.    100 days from the date of filing was May 27, 2016.

188.    HACC only conveyed its (conditional) offer to Diane around May 25, 2016—a few days before IDHR's 100-day deadline.

189.    Then, by letter dated May 26, 2016, IDHR informed Diane that the investigation had not been completed within 100 days. In that letter, IDHR said that it had not yet completed the investigation because it needed to: "Complete interviews with parties and/or witnesses"; "Include other HUD program offices and/or State, local or other federal agencies in the investigation"; "Make additional efforts to conciliate (settle) the complaint"; and "Finish writing a report of the investigation."

190.    Although the May 16, 2016 100-day letter suggested that IDHR needed to "[c]omplete interviews" to finish the investigation, in IDHR Investigator Wagner's Final Investigative Report from June 20, 2017, she recorded only two interviews—one with Sheryl Seiling on May 22, 2017, and the other with Diane on June 15, 2017.

191.    The 100-day letter also stated that the "projected date for completion of the investigation" was June 20, 2016.

192.    However, IDHR did not actually complete the investigation until June 20, 2017— a full year after the projected completion date, and more than 17 months after Diane had filed the initial administrative charge.

193.    Eventually, on March 8, 2017, IDHR investigator Wagner sent Diane a letter stating that "[i]t is very important that either you or Ms. Woods contact me immediately, but no

later than March 16, 2017, to schedule a rebuttal interview." "If I do not hear from you by March 16, 2017, I will have no alternative but to complete the investigation based on the information available."

194.    On March 15, 2017, Diane filed the instant lawsuit.

195.    By the time IDHR finally completed its investigation, circumstances had fundamentally changed: Jake had graduated from high school and enlisted in the military, losing his opportunity to go to college; Diane was no longer able to buy a home in Lemont, Illinois through the Home Ownership Program, both because she could not afford a home in Lemont on a 1-bedroom voucher and because she had spent the money she had saved for a down payment on Jake's medical expenses.

196.    IDHR could have avoided these lengthy delays by acting as a neutral investigator instead of working closely with HACC to try and convince Diane to settle her case on unfavorable terms and withdraw her complaint.

**IDHR discriminated against Diane by refusing to allow Ms. Woods to participate in Diane's communications with IDHR and by refusing to allow Diane to talk to IDHR's ADA Coordinator**

197.    IDHR also impermissibly discriminated against Diane by refusing to allow her to use Ms. Woods, her aide, as a communication aid during important conversations and communications with IDHR.

198.    In a phone call, Diane asked IDHR investigator Mr. Moen to continue to allow Ms. Woods to participate on her phone calls with IDHR, as had previously been done numerous times.

199.    This time Mr. Moen denied Diane's request for this reasonable accommodation and instead insisted that Ms. Woods would need to email him and state that she was allowed to

communicate with him on behalf of Diane—instead of allowing both Diane and Ms. Woods to participate in communications with IDHR.

200.    Afterward, IDHR communicated with Ms. Woods instead of allowing Ms. Woods to assist Diane in communicating directly with IDHR.

201.    Reasonable accommodations like allowing a support person to help a person with a communication disorder to communicate should be granted; they are routinely granted to the hard of hearing who are provided sign language interpreters to assist in communication with others.

202.    Diane was deliberately denied access to have her advocate help her interpret conversations with IDHR, even after IDHR knew how critical such assistance was to Diane and had previously allowed her to do this on several occasions.

203.    In fact, IDHR itself has actually acknowledged that it was improper for Mr. Moen to force Ms. Woods to speak on Diane's behalf, as opposed to allowing Ms. Woods to assist Diane in communicating.

204.    In March 2017, IDHR investigator Angela Wagner told Diane that she saw where Mr. Moen "deviated from Agency policy in allowing Ms. Woods to speak for you. I will not be doing that."

205.    But Diane did not want Ms. Woods to speak for her; she simply wanted Ms. Woods to participate in calls and communications with IDHR as a support due to Diane's communication and processing difficulties. It was IDHR investigator Mr. Moen who improperly forced Ms. Woods to speak on Diane's behalf.

206. IDHR's repeated refusals to allow Ms. Woods to assist Diane in her communications with IDHR violated its obligations to ensure that disabled people like Diane are able to have as effective communication with IDHR as non-disabled people.

207. IDHR also refused to allow Diane to speak with IDHR's ADA Coordinator. Diane asked IDHR investigator Wagner to allow her to speak with the ADA Coordinator to help explain Diane's communication and processing difficulties and why she needed assistance from Ms. Woods in her communications with IDHR.

208. Instead of allowing Diane to talk to IDHR's ADA Coordinator, Ms. Wagner told Diane that that was not the ADA Coordinator's job.

**IDHR's final investigative report on Diane's administrative charge ignored crucial facts and highlighted blatant deficiencies in the investigation process that violated the injunction in *Cooper v. Salazar***

209. On June 20, 2017, IDHR completed its final investigative report.

210. After the report was issued, IDHR closed Diane's file after finding that there was "no cause" to indicate that HACC had violated Diane's or Jake's rights.

211. However, the final report revealed how both HACC and IDHR contorted the story to justify HACC's refusal to restore Jake back to Diane's voucher when she asked in early 2016.

212. IDHR identified two primary reasons in support of its conclusion, both of which disregard substantial evidence in the case file and beyond, which would have been easily discoverable with a proper and thorough investigation.

213. The first identified basis for IDHR's no cause determination was that Diane "did not ask for a reasonable accommodation to add her son back to her vouch[er], but instead sought clarification as to if it were possible or not."

214. But IDHR's position completely ignores HACC's and HUD's own guidance that as long as a person indicates that a change to a policy is necessary, HACC should treat it as a

33

request for a reasonable accommodation: "[i]f an applicant or participant indicates that an exception, or adjustment to a rule, policy, practice, or service is needed because of a disability, HUD requires that the HACC treat the information as a request for a reasonable accommodation, even if no formal request is made." HACC Administrative Plan § 2-II.C., at p. 18 (2015).

215. IDHR's interpretation also ignores that in addition to making multiple verbal requests to HACC's Ms. Johnson in early 2016 and sending multiple emails explaining what result she was seeking and why, on February 5, 2016, Diane sent an email to HACC Supervisor Sheryl Seiling (who was interviewed by IDHR for its final report), titled "**appeal for reinstatement of son with disability on voucher," stating: "I am asking again, may my son please be added back to my voucher now that he is graduating from high school where he resides? . . . I do not see how this is unreasonable.**" And in her Housing/Realestate Transaction Complainant Information Sheet, filed that same day, Diane stated that HACC would "not allow" Jake back on the voucher because of "some sort of administrative code." "[W]hen i asked ms. Johnson about consideration due to disability status, she told me that was not possible."

216. HACC and IDHR both understood and treated Diane's request to add Jake back to her voucher as a request for a reasonable accommodation. For example:

    a)     IDHR's Stan Moen, the original investigator assigned to Diane's case, wrote in his own notes that "**CP [complaining party, i.e., Diane] wants an accommodation for son's disability to add him to voucher**."

    b)     In an email from IDHR's Lou Meltesen (Manager of IDHR's Fair Housing Division) to HUD, Mr. Meltesen characterized Diane's request as a request for a reasonable accommodation: "Complainant [Diane] requested to have him [Jake] added back onto her voucher when he completed the program in June so that he could return to living with her. . . . Complainant further contends that her son is not capable of living on his own and that **she is requesting that he be added back on her voucher as an accommodation for her and her son's disability**."

    c)     Sheryl Seiling, a HACC supervisor, told IDHR investigator Angela Wagner that "**In February she sent another email requesting that he be**

**put back on the voucher in June 2015, after he graduates from high school.**"

217.     The second identified basis for IDHR's no cause determination was that even if Diane had requested a reasonable accommodation, it was not "medically necessary" and would not have affected Diane's ability to "enjoy the premises."

218.     Again, IDHR's conclusion ignored substantial evidence in the record and beyond, which would have been easily discoverable with a proper and thorough investigation, showing that Jake was a young disabled man who could not live on his own due to his disabilities (which was why he was attending Brehm Prep), and that HACC knew or should have known that the accommodation was necessary for him to obtain access to the Housing Voucher Program and to avoid homelessness.

219.     IDHR never should have known that the accommodation was necessary to allow Jake, who was only removed from the voucher because of his disability, to be added back to avoid the possibility of homelessness because he was a young disabled man who could not live on his own due to his disabilities.

## CAUSES OF ACTION

### COUNT 1

**Denial of a Reasonable Accommodation in Violation of
the FHAA, 42 U.S.C. § 3601, *et seq.*, as amended
(Against Defendant HACC)**

220.     Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

221.     At all times relevant, there was in full force and effect a statute known as the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, as amended. The FHAA prohibits discrimination against "any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the

provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Discrimination on the basis of a disability is also prohibited. 42 U.S.C. § 3604(f). And it is unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by sections 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. Section 504, as amended at 29 U.S.C. § 794 and the ADA, 42 U.S.C. § 12101, *et seq.* have similar provisions.

222.    Plaintiffs Diane Field and Jake Hoffman are qualified individuals with a disability under the FHAA. Defendant HACC knew or should have known that Diane and Jake are people with disabilities. Diane repeatedly told HACC on the phone and in email communications that she and Jake are disabled.

223.    Through HACC's acts described above, HACC discriminated against Plaintiffs Diane and Jake on the basis of disability in violation of the FHAA.

224.    Under the FHAA, HACC is required to make reasonable accommodations in its policies, practices, and procedures when the accommodations are necessary to avoid discriminating on the basis of disability and would not fundamentally alter the nature of HACC's programs, services, or activities.

225.    Diane repeatedly indicated to HACC through email and telephone that she wanted HACC to modify its rules, policies, practices, or services to allow her son Jake to be added back to her housing voucher. This was a request for a reasonable accommodation under the FHAA on behalf of Jake, Diane's disabled son.

226.     The accommodation Diane requested was necessary to allow her disabled son—Jake—to live with her in her rental home. Under HUD and HACC guidelines, only people listed on the Section 8 voucher are legally allowed to live in the home. But because Jake was previously removed from Diane's voucher, an administrative rule allegedly precluded Jake from being added back. Without the requested accommodation, Jake, who could not live independently due to his disabilities, would be denied equal opportunity to access housing.

227.     Adding Jake back to Diane's voucher would not require an undue financial or administrative burden on HACC or require HACC to fundamentally alter any aspect of its programs. The request simply required HACC to waive a two-sentence administrative rule in its Administrative Plan with respect to one person—Jake Hoffman. HACC has since acknowledged that it *can* make an accommodation to add Jake back to Diane's voucher.

228.     But Defendant HACC, through the acts described above, violated the FHAA by rejecting Diane's request for a reasonable accommodation and not properly considering whether HACC could grant the request.

229.     HACC's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

230.     Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c) (2).

## COUNT 2

**Denial of a Reasonable Accommodation in Violation of the ADA, § 42 U.S.C. 12101, *et seq.*
(Against Defendant HACC)**

231.     Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

232.    At all times relevant, there was in full force and effect a statute known as the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, as amended. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101(b)(l). In so doing, Congress found that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination." *Id*. Congress further found that "discrimination against individuals with disabilities exists in such critical areas as . . . housing . . ." *Id.* § 12101(a)(3).

233.    The ADA and its regulations state:

a)    Impose a broad nondiscrimination mandate that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by a public entity. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

b)    Require that a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7)(i).

c)    Prohibit a public entity from imposing or applying eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered. 28 C.F.R. § 35.130(b)(8).

d)    Require that a public entity shall take appropriate steps to ensure that communications with participants with disabilities are as effective as communications with others. 28 C.F.R. § 35.160(a).

234.    Plaintiffs Diane Field and Jake Hoffman are qualified individuals with a disability under the ADA. Defendant HACC knew or should have known that Diane and Jake are people

with disabilities. Diane repeatedly told HACC on the phone and in email communications that she and Jake are disabled.

235. Through HACC's acts described above, HACC discriminated against Plaintiffs Diane and Jake on the basis of disability in violation of the ADA.

236. Under the ADA, HACC is required to make reasonable accommodations in its policies, practices, and procedures when the accommodations are necessary to avoid discriminating on the basis of disability and would not fundamentally alter the nature of HACC's programs, services, or activities.

237. Diane repeatedly indicated to HACC through email and telephone that she wanted HACC to modify its rules, policies, practices, or services to allow her son Jake to be added back to her housing voucher. This was a request for a reasonable accommodation under the ADA on behalf of Jake, Diane's disabled son.

238. The accommodation Diane requested was necessary to allow her disabled son— Jake—to live with her in her rental home. Under HUD and HACC guidelines, only people listed on the Section 8 voucher are legally allowed to live in the home. But because Jake was previously removed from Diane's voucher, an administrative rule allegedly precluded Jake from being added back. Without the requested accommodation, Jake, who could not live independently due to his disabilities, would be denied equal opportunity to access housing.

239. Adding Jake back to Diane's voucher would not require an undue financial or administrative burden on HACC or require HACC to fundamentally alter any aspect of its programs. The request simply required HACC to waive a two-sentence administrative rule in its Administrative Plan with respect to one person—Jake Hoffman. HACC has since acknowledged that it can make an accommodation to add Jake back to Diane's voucher.

240.    But Defendant HACC, through the acts described above, violated the ADA by rejecting Diane's request for a reasonable accommodation and not properly considering whether HACC could grant the request.

241.    HACC's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

242.    Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

**COUNT 3**

**Denial of a Reasonable Accommodation in Violation of
Section 504, as amended at 29 U.S.C. § 794
(Against Defendant HACC)**

243.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

244.    Defendant HACC receives federal financial assistance within the meaning of Section 504.

245.    At all relevant times, there was in full force and effect a statute known as the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, and its implementing regulations 49 C.F.R. § 27.7, which provide in pertinent part:

   a)    "No qualified person with a disability . . . shall, solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance . . ." 49 C.F.R. § 27.7(a).

   b)    An individual with a disability is "otherwise qualified" to participate in covered programs and activities if that individual "meets the essential eligibility requirements for the receipt of such services." 49 C.F.R. § 27.5.

   c)    "A recipient, in providing any aid, benefit or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability: (i) Deny a qualified person with a disability the opportunity to participate in or benefit from the aid, benefit or service; . . . (iii) Provide a

qualified person with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefits, . . . as persons who are not disabled; . . . (vii) Otherwise limit a qualified person with a disability in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving an aid, benefit or service." 49 C.F.R. § 27.7(b).

246. Plaintiffs Diane Field and Jake Hoffman are each qualified individuals with a disability under Section 504. Defendant HACC knew or should have known that Diane and Jake are people with disabilities. Diane repeatedly told HACC on the phone and in email communications that she and Jake are disabled.

247. Plaintiff's Diane and Jake are qualified to receive HACC's benefits and services.

248. Through HACC's acts described above, HACC discriminated against Plaintiffs Diane and Jake on the basis of disability in violation of Section 504.

249. Under Section 504, HACC is required to make reasonable accommodations in its policies, practices, and procedures when the accommodations are necessary to avoid discriminating on the basis of disability and would not fundamentally alter the nature of HACC's programs, services, or activities.

250. Diane repeatedly indicated to HACC through email and telephone that she wanted HACC to modify its rules, policies, practices, or services to allow her son Jake to be added back to her housing voucher. This was a request for a reasonable accommodation under Section 504 on behalf of Jake, Diane's disabled son.

251. The accommodation Diane requested was necessary to allow her disabled son— Jake—to live with her in her rental home. Under HUD and HACC guidelines, only people listed on the Section 8 voucher are legally allowed to live in the home. But because Jake was previously removed from Diane's voucher, an administrative rule allegedly precluded Jake from

being added back. Without the requested accommodation, Jake, who could not live

independently due to his disabilities, would be denied equal opportunity to access housing.

252.     Adding Jake back to Diane's voucher would not require an undue financial or

administrative burden on HACC or require HACC to fundamentally alter any aspect of its

programs. The request simply required HACC to waive a two-sentence administrative rule in its

Administrative Plan with respect to one person—Jake Hoffman. HACC has since acknowledged

that it *can* make an accommodation to add Jake back to Diane's voucher.

253.     But Defendant HACC, through the acts described above, violated Section 504 by

rejecting Diane's request for a reasonable accommodation and not properly considering whether

HACC could grant the request.

254.     Section 505(a) (2) of the Rehabilitation Act, 29 U.S.C. § 794(a) (2), states that the

"remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [being

42 U.S.C. § 2000(d), *et seq.*], shall be available" for violations of Section 504. By law, such

remedies include compensatory monetary damages. *Barnes v. Gorman*, 563 U.S. 181 (2002).

255.     HACC's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake,

including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

256.     Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to

Section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## COUNT 4

### Retaliation and Intimidation in Violation of the FHAA, 42 U.S.C. § 3617
### (Against Defendant HACC)

257.     Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the

proceeding paragraphs above.

258.    The FHAA makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by sections 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

259.    HACC caseworker Phyllis Johnson threatened and intimidated Diane, because Diane merely informed Ms. Johnson that she would file a complaint with HUD or IDHR if HACC would not add Jake back to her voucher.

260.    Defendant HACC, through the acts described above, coerced, intimidated, threatened, and interfered in Diane's and Jake's exercise and enjoyment of the rights granted and protected by the FHAA.

261.    HACC's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

262.    Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c) (2).

## COUNT 5

### Retaliation and Intimidation in Violation of the ADA, 42 U.S.C. § 12203
### (Against Defendant HACC)

263.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

264.    The ADA makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise of, any right granted or protected by this Act." 42 U.S.C. § 12203.

265.    HACC caseworker Phyllis Johnson threatened and intimidated Diane, because Diane merely informed Ms. Johnson that she would file a complaint with HUD or IDHR if HACC would not add Jake back to her voucher.

266.    Defendant HACC, through the acts described above, coerced, intimidated, threatened, and interfered in Diane's and Jake's exercise and enjoyment of the rights granted and protected by the ADA.

267.    HACC's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

268.    Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

## COUNT 6

### Retaliation and Intimidation in Violation of
### Section 504, as amended at 29 U.S.C. § 794
### (Against Defendant HACC)

269.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

270.    Section 504, like the ADA makes it unlawful to coerce, intimidate, threaten, or interfere with any individual's exercise or enjoyment of the rights granted or protected by Section 504.

271.    HACC caseworker Phyllis Johnson threatened and intimidated Diane, because Diane merely informed Ms. Johnson that she would file a complaint with HUD and IDHR if HACC would not add Jake back to her voucher.

272.    Defendant HACC, through the acts described above, coerced, intimidated, threatened, and interfered in Diane's and Jake's exercise and enjoyment of the rights granted and protected by Section 504.

273.    HACC's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

274.    Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to Section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## COUNT 7

**Denial of Equal Access in Violation of the ADA, § 42 U.S.C. 12101, *et seq.***
**(Against Defendant HACC)**

275.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

276.    Plaintiff Diane Field is a qualified individual with a disability under the ADA.

277.    Through HACC's acts described above, HACC discriminated against Diane on the basis of disability in violation of the ADA.

278.    Under the ADA, HACC is prohibited from excluding Diane from participation in or denying her the benefits of its services, programs, and activities on account of disability.

279.    Under the ADA, HACC is required to ensure that communications with Diane and other people with communication disorders are as effective as communications with people without communication disorders, including through the provision of aides or other services.

280.    By failing to allow Diane's speech and language therapist, Judy Ball, to participate in her phone calls with HACC, HACC denied Diane the same access to services, benefits, activities, and programs because of her disabilities.

281.    Through this conduct, HACC failed to ensure equally effective communications with Diane in violation of the ADA.

282.    HACC's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

283.    Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

## COUNT 8

### Denial of Equal Access in Violation of Section 504,
### as amended at 29 U.S.C. § 794
### (Against Defendant HACC)

284.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

285.    Plaintiff Diane Field is a qualified individual with a disability under Section 504.

286.    Through HACC's acts described above, HACC discriminated against Diane on the basis of disability in violation of Section 504.

287.    Under Section 504, HACC is prohibited from excluding Diane from participation in or denying her the benefits of its services, programs, and activities on account of disability.

288.    Under Section 504, HACC is required to ensure that communications with Diane and other people with communication disorders are as effective as communications with people without communication disorders, including through the provision of aides or other services.

289.    By failing to allow Diane's speech and language therapist, Judy Ball, to participate in her phone calls with HACC, HACC denied Diane the same access to services, benefits, activities, and programs because of her disabilities.

290.    Through this conduct, HACC failed to ensure equally effective communications with Diane in violation of Section 504.

291.    HACC's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

292.    Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to Section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

46

## COUNT 9

### Denial of Equal Access in Violation of the ADA, § 42 U.S.C. 12101, *et seq.* (Against Defendant IDHR)

293.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

294.    Plaintiff Diane Field is a qualified individual with a disability under the ADA.

295.    Through IDHR's acts described above, IDHR discriminated against Diane on the basis of disability in violation of the ADA.

296.    Under the ADA, IDHR is prohibited from excluding Diane from participation in or denying her the benefits of its services, programs, and activities on account of disability.

297.    Under the ADA, IDHR is required to ensure that communications with Diane and other people with communication disorders are as effective as communications with people without communication disorders, including through the provision of aides or other services.

298.    IDHR should have allowed Diane's aide, Ms. Woods, to assist Diane in her communications with IDHR. Instead, IDHR investigator Moen forced Ms. Woods to speak on Diane's behalf, preventing Diane from direct participation in IDHR's investigation. As a result, IDHR denied Diane the same access to services, benefits, activities, and programs because of her disabilities.

299.    Through this conduct, IDHR failed to ensure equally effective communications with Diane in violation of the ADA.

300.    IDHR's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

301.    Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

## COUNT 10

**Denial of Equal Access in Violation of
Section 504, as amended at 29 U.S.C. § 794
(Against Defendant IDHR)**

302.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

303.    Plaintiff Diane Field is a qualified individual with a disability under Section 504.

304.    Through IDHR's acts described above, IDHR discriminated against Diane on the basis of disability in violation of Section 504.

305.    Under Section 504, IDHR is prohibited from excluding Diane from participation in or denying her the benefits of its services, programs, and activities on account of disability.

306.    Under Section 504, IDHR is required to ensure that communications with Diane and other people with communication disorders are as effective as communications with people without communication disorders, including through the provision of aides or other services.

307.    IDHR should have allowed Diane's aide, Ms. Woods, to assist Diane in her communications with IDHR. Instead, IDHR investigator Moen forced Ms. Woods to speak on Diane's behalf, preventing Diane from direct participation in IDHR's investigation. As a result, IDHR denied Diane the same access to services, benefits, activities, and programs because of her disabilities.

308.    Through this conduct, IDHR failed to ensure equally effective communications with Diane in violation of Section 504.

309.    IDHR's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

310.    Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to Section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## COUNT 11

**Retaliation and Intimidation in Violation of the ADA, 42 U.S.C. § 12203**
**(Against Defendant IDHR)**

311.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

312.    The ADA makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise of, any right granted or protected by this Act." 42 U.S.C. § 12203.

313.    Defendant IDHR, coerced, intimidated, threatened, and interfered in Diane and Jake's exercise and enjoyment of the rights granted and protected by, among other things, failing to conduct a fair and neutral investigation into Diane's charge, steering Diane to withdraw her charge against HACC, encouraging Diane to settle her case under terms favorable to HACC and detrimental to Diane, and improperly preventing Diane from including allegations against Ms. Johnson in her perfected charge.

314.    IDHR's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

315.    Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

## COUNT 12

**Retaliation and Intimidation in Violation of**
**Section 504, as amended at 29 U.S.C. § 794**
**(Against Defendant IDHR)**

316.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

317. Section 504, like the ADA makes it unlawful to coerce, intimidate, threaten, or interfere with any individual's exercise or enjoyment of the rights granted or protected by Section 504.

318. Defendant IDHR, coerced, intimidated, threatened, and interfered in Diane and Jake's exercise and enjoyment of the rights granted and protected by, among other things, failing to conduct a fair and neutral investigation into Diane's charge, steering Diane to withdraw her charge against HACC, encouraging Diane to settle her case under terms favorable to HACC and detrimental to Diane, and improperly preventing Diane from including allegations against Ms. Johnson in her perfected charge.

319. IDHR conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

320. Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to Section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## COUNT 13

**Denial of a Reasonable Accommodation in Violation of the ADA, 42 U.S.C. § 12101, *et seq.*
(Against Defendant IDHR)**

321. Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

322. Plaintiff Diane Field is a qualified individual with a disability under the ADA. Defendant IDHR knew or should have known that Diane is a person with disabilities.

323. Through IDHR's acts described above, IDHR discriminated against Diane on the basis of disability in violation of the ADA.

324. Under the ADA, IDHR is required to make reasonable accommodations in its policies, practices, and procedures when the accommodations are necessary to avoid

discriminating on the basis of disability and would not fundamentally alter the nature of IDHR's programs, services, or activities.

325.     Diane indicated to IDHR through email and on the phone that she wanted her advocate, Suzy Woods, to be able to participate in her conversations with IDHR employees. This was a request for a reasonable accommodation under the ADA.

326.     The accommodation Diane requested was necessary to allow her to effectively communicate and understand what was happening with her charge against HACC. Because of Diane's disabilities, she often has problems communicating with and understanding other people. Without the requested accommodation Diane was not able to equally participate in IDHR's investigation.

327.     The accommodation Diane requested was reasonable. It would not require an undue financial or administrative burden or require IDHR to fundamentally alter any aspect of its programs. The request simply required IDHR to allow Diane's aide to participate in conversations between Diane and IDHR through the telephone.

328.     But Defendant IDHR rejected Diane's request for a reasonable accommodation.

329.     By denying the reasonable accommodation, IDHR violated the ADA.

330.     IDHR's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

331.     Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205.

## COUNT 14

**Denial of a Reasonable Accommodation in Violation of
Section 504, as amended at 29 U.S.C. § 794
(Against Defendant IDHR)**

332.    Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

333.    Plaintiff Diane Field is a qualified individual with a disability under Section 504. Defendant IDHR knew or should have known that Diane is a person with disabilities.

334.    Defendant IDHR receives federal financial assistance within the meaning of Section 504.

335.    Through IDHR's acts described above, IDHR discriminated against Plaintiff Diane on the basis of disability in violation of Section 504.

336.    Under Section 504, IDHR is required to make reasonable accommodations in its policies, practices, and procedures when the accommodations are necessary to avoid discriminating on the basis of disability and would not fundamentally alter the nature of IDHR's programs, services, or activities.

337.    Diane indicated to IDHR through email and on the phone that she wanted her advocate, Suzy Woods, to be able to participate in her conversations with IDHR employees. This was a request for a reasonable accommodation under Section 504.

338.    The accommodation Diane requested was necessary to allow her to effectively communicate and understand what was happening with her charge against HACC. Because of Diane's disabilities, she often has problems communicating with and understanding other people. Without the requested accommodation Diane was not able to equally participate in IDHR's investigation.

339.     The accommodation Diane requested was reasonable. It would not require an undue financial or administrative burden or require IDHR to fundamentally alter any aspect of its programs. The request simply required IDHR to allow Diane's aide to participate in conversations between Diane and IDHR through the telephone.

340.     But Defendant IDHR rejected Diane's request for a reasonable accommodation.

341.     By denying the reasonable accommodation, IDHR violated Section 504.

342.     IDHR's conduct has inflicted injury and damages upon Plaintiffs Diane and Jake, including loss of civil rights, mental anguish, humiliation, and mental pain and suffering.

343.     Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to Section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## COUNT 15

### Violation of the Injunction in *Cooper v. Salazar*
### (Against Defendant IDHR)

344.     Plaintiffs Diane Field and Jake Hoffman incorporate and reallege each of the proceeding paragraphs above.

345.     Defendant IDHR is under a federal-court injunction that orders IDHR "to cease permanently from relying on credibility determinations made without affording the rights of confrontation and cross-examination." *See Cooper v. Salazar*, 98 C 2930, 2001 U.S. Dist. LEXIS 17952, at *33 (N.D. Ill. Nov. 1, 2001).

346.     Under the injunction IDHR "cannot assess the credibility of Complainant's testimony, the testimony of Complainant's witnesses or the testimony of Respondent's representatives or the witnesses of Respondent where there is conflicting testimony."

347.     As a result, this means that "if a determination of lack of substantial evidence requires the Department to make a finding of fact as to conflicting evidence, the Department will

make a finding of substantial evidence so that credibility may be resolved by the Human Rights

Commission at a Public Hearing or in circuit court."

348.    Under the Illinois Human Rights Act, "substantial evidence" means "evidence

which a reasonable mind accepts as sufficient to support a particular conclusion and which

consists of more than a mere scintilla but may be somewhat less than a preponderance." Illinois

Human Rights Act § 7A-102(D)(2).

349.    IDHR violated the *Cooper v. Salazar* injunction when it made impermissible (and

incorrect) credibility determinations that: (1) HACC supposedly told Diane that Jake could not

be added back to her voucher once he was removed; (2) HACC employee Phyllis Johnson

supposedly did not threaten Diane during a February 5, 2016 telephone call; (3) Diane did not

request a reasonable accommodation from HACC in her telephone conversations with HACC

and her February 5, 2016 emails to HACC; and (4) IDHR investigator Stan Moen's statements to

Diane that he would credit HACC's statements over hers.

350.    By making a finding of a lack of substantial evidence despite the existence of

conflicting evidence, IDHR is in direct violation of the *Cooper v. Salazar* injunction.

## **PRAYER FOR RELIEF**

Plaintiffs pray that the Court grant the following relief:

1.    A declaration that HACC violated the FHAA, the ADA, and Section 504:

   a)    By failing to properly inform Diane about the Housing Voucher Program's
         policies, resulting in Jake's unnecessary and improper removal from
         Diane's voucher;

   b)    By refusing to grant Diane's request for a reasonable accommodation to
         add Jake back to her housing voucher;

   c)    By intimidating Diane, a former victim of domestic abuse, accusing her
         falsely of threatening a HACC staff person merely by making statements
         of fact;

  d)  By refusing to allow Diane to use her speech and language therapist, Judy Ball, to participate in important communications with HACC;

  e)  By negatively impacting Diane's ability to buy a home and potentially preventing Diane from being able to buy a home in her community of Lemont, Illinois through HACC's Home Ownership Program.

2.  An order requiring HACC to:

  a)  To pay compensatory damages;

  b)  To pay punitive damages;

  c)  To pay reasonable attorneys' fees and costs;

  d)  To hire an ADA Coordinator and update its ADA and Section 504 Plan to be consistent with the Court's order and applicable law;

  e)  To allow Jake to be added back to her housing voucher and restore it to a 2-bedroom voucher;

  f)  To provide assistance to Diane to expedite her purchase of a house in Lemont, Illinois using its program resources;

  g)  To assign Diane a new HACC caseworker other than Phyllis Johnson.

3.  A declaration that IDHR violated the ADA and Section 504:

  a)  By failing to conduct a fair and neutral investigation into Diane's complaint and instead attempting to persuade Diane to settle her complaint with HACC under terms favorable to HACC and detrimental to Diane;

  b)  By denying Diane a reasonable accommodation to allow her aide Suzy Woods to participate in important communications with IDHR and Diane;

  c)  By steering Diane to withdraw her charge against HACC;

  d)  By failing to include all the legitimate claims of the Plaintiff in the perfected charge;

  e)  By failing to allow Diane to talk to IDHR's ADA Coordinator;

  f)  By making impermissible and incorrect credibility determinations in violation of *Cooper v. Salazar*.

4.  An order requiring that IDHR:

  a)  To pay compensatory damages;

b)      To pay reasonable attorneys' fees and costs;

c)      To pay punitive damages;

d)      Designate and publicize an ADA Coordinator;

e)      Update its ADA and Section 504 Compliance Plan to ensure such violations do not happen again;

f)      Be prevented from receiving referrals from HUD to investigate housing complaints under the Fair Housing Assistance Program.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all issues.


Dated: November 16, 2017                              Respectfully submitted,

                                                     */s/ Richard P. Steinken*
                                                     One of Plaintiffs' attorneys

                                                     Richard P. Steinken
                                                     Justin A. Maleson
                                                     Jory M. Hoffman
                                                     Jenner & Block LLP
                                                     353 North Clark Street
                                                     Chicago, IL 60654
                                                     (312) 222-9350